IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 25, 2023 Session

## STATE OF TENNESSEE v. JOSHUA STEVEN SULLIVAN

**Appeal from the Criminal Court for Knox County**
**No. 117338   Steven W. Sword, Judge**

_____

### No. E2022-00962-CCA-R3-CD

_____


A Knox County jury convicted the Defendant, Joshua Steven Sullivan, of two counts of rape of a child, one count of attempted rape of a child, and one count of aggravated sexual battery. The trial court imposed a total effective sentence of forty-two years. The Defendant argues that the trial court committed several evidentiary errors, including by admitting evidence that (1) the victim made statements to her sister and best friend as excited utterances; (2) he told officers they needed a warrant to enter the house and that he was on his way to his attorney's office; (3) he had prior convictions for purposes of impeachment; and (4) he removed his GPS monitoring bracelet and left the jurisdiction while on pretrial release. The Defendant also asserts that the trial court erred in instructing the jury regarding flight and that the cumulative effect of these errors entitles him to a new trial. Finally, he asserts that the trial court erred in imposing consecutive sentences. Upon review, we conclude that harmless errors exist in the admission of the Defendant's statements related to his purported exercise of constitutional rights. Otherwise, we respectfully affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

Jonathan Harwell (on appeal) and Keith Lowe (at trial), Assistant District Public Defenders, Knoxville, Tennessee, for the appellant, Joshua Steven Sullivan.

Jonathan Skrmetti, Attorney General and Reporter; Courtney N. Orr, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Ashley McDermott and Jordan Murray, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

In 2019, the victim was eleven years old, and she lived with her mother and siblings in Powell, Tennessee. Her mother was dating the Defendant at the time, and the Defendant and his son also lived at the residence.

During the early morning hours of September 2, 2019, the victim was sleeping in her bedroom when she was awakened by the Defendant coming into her room. The Defendant got into bed with the victim and repeatedly tried to pull down her shorts. Eventually, the Defendant removed her clothes and penetrated the victim's vagina with his penis.

The Defendant then "scooted down" on the bed and placed his mouth on the victim's vagina while he held her legs down and touched her breast with his hand. Next, the Defendant penetrated her anus with his penis, and it hurt. The Defendant then told the victim not to tell anyone, or he would hurt her mother. The threat frightened the victim.

That night, the victim spoke with her best friend through a video chat application on her cell phone. The victim was crying, distraught, and "breaking down really bad." She told her friend that the Defendant had raped her. Her friend told the victim she needed to tell someone, and the victim told her older sister that the Defendant had raped her.

The victim then told her mother that the Defendant had raped her. The mother then called the victim's grandmother to get her and her daughters. On her way to pick them up, the grandmother called the police. During this time, the Defendant left the house in the mother's van.

The grandmother took the victim and her mother to a convenience store to meet with law enforcement officers. While at the convenience store, the mother saw the Defendant drive by in her van, and she noted this for the officers. Officers then pursued the Defendant, but were unable to find him.

The victim and her mother were then taken to the hospital so the victim could be "swabbed and tested." A detective asked the mother about possible evidence, such as sheets, underwear, or shorts. The mother responded that the victim's underwear had been washed but that she was wearing the shorts she had on at the time of the rape. Additionally, she said the victim's sheets were still on her bed.

While the victim and her mother were at the hospital, other officers were dispatched to the victim's house to contact the Defendant and collect evidence. They arrived at her house at about 11:00 p.m. and encountered the Defendant's son speaking with the Defendant on his cell phone. Through the phone, the Defendant told the officers, "You need a warrant." When one of the officers asked the Defendant where he was, the Defendant replied, "I'm headed to my lawyer's office. What's going on?"

The officers nevertheless entered the residence, discovered the victim's comforter and sheets were being washed, and notified the crime scene technicians. The Defendant's son said that the Defendant had instructed him to clean the victim's bedding "because there was, like, drug residue all over them." In fact, the Defendant's son said that the Defendant "made me show him me washing them."

Kim Lowe, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI), detected male DNA on a swab from the victim's vaginal cavity. She obtained a "Y-STR profile" from the male DNA. The Defendant could not be excluded as the source of the profile. His son also could not be excluded because, as father and son, "they have the exact same DNA profile on the Y chromosome."

As is relevant to this case, a Knox County grand jury charged the Defendant with rape of a child by anal sex on count one; rape of a child by vaginal sex on count two; rape of a child by oral sex on count three; and aggravated sexual battery by touching the victim's breasts on count four.[1] The case was tried before a jury in November 2021.

During defense proof, the Defendant testified that he went downstairs to check on the victim on the night of the offense. He said he opened her door and discovered his son in bed with her. The Defendant did not tell the victim's mother because he did not want to get his son in trouble.

The Defendant denied having vaginal, anal, or oral sex with the victim or touching her breasts. He said that the victim was "making that up" and "lying about [him]."

---

[1] Although the grand jury also charged the Defendant with rape under other theories and with kidnapping, the State dismissed these counts before trial, and they are not at issue in this appeal. Following the dismissal, and with the parties' agreement, the trial court renumbered the counts of the presentment before submitting them to the jury. This was a permissible procedure to ensure that the jury was unaware of other criminal offenses with which the Defendant was charged initially. *See State v. Bullock*, No. E2021-00661-CCA-R3-CD, 2022 WL 3012460 (Tenn. Crim. App. July 29, 2022), *no perm. app. filed*. The jury returned its verdicts referencing the renumbered counts, and for clarity, we use these renumbered counts in our analysis as well.

The Defendant testified that on the night the victim told her mother about the offense, he took the victim's mother's van so he could buy cigarettes and "drop[] some weed off[.]" The Defendant admitted that he passed by the convenience store where the victim and her mother were speaking to police. Shortly afterward, he called his son. He said that his son was "freaking out" because everyone had left the house, and he heard someone say, "[H]e touched [the victim.]" The Defendant, who thought his son was referring to himself, told his son to wash the victim's bedding if he "did anything" to the victim.

Instead of returning to the victim's house, the Defendant left the mother's van on a side road and stayed with a friend at her house. Later that evening, the Defendant said that his son contacted him by video chat and told him that officers were at the victim's house. When officers asked the Defendant where he was, he responded that he was "on [his] way to see [his] lawyer." At trial, the Defendant explained that he was actually waiting to talk to his attorney and agreed that "waiting" was different from going to see his lawyer. The Defendant admitted, "I wasn't . . . directly on my way to see him. It was at nighttime, and I had to wait to get ahold of him."

While staying with his friend, the Defendant asked his son to bring him clothes. The Defendant said that he did not return to the mother's house because he was told not to be there and because he did not want the police to "come get [him]."

Finally, the Defendant admitted that he exchanged apologetic Snapchat messages with the victim's mother about ten days after the rapes. In these messages, the Defendant said, "I know you don't deserve any of this[.] . . . I can't change it." He said that he wanted "to be done," that he did not "want to be here," and that he "want[ed] to die[.]" The Defendant continued to apologize and sent the mother a photograph of him holding a remote control to his head. The Defendant said that he "was in a bad place. I just lost my house, my family, everything." The Defendant then sent her a message saying, "All I got to do is pull the trigger. You got the kids, though, right?" In a separate Snapchat to the mother, the Defendant explained, "I deserve to die."

The jury found the Defendant guilty of attempted rape of a child on count one, guilty of rape of a child on counts two and three, and guilty of aggravated sexual battery on count four. Following a sentencing hearing, the trial court sentenced the Defendant to serve concurrent sentences of twelve years on counts 1 and 4 and to serve concurrent sentences of thirty years on counts 2 and 3. The trial court ordered the twelve-year sentences to be served consecutively to the thirty-year sentences for a total effective sentence of forty-two years.

The judgments of conviction were filed on February 7, 2022, and the Defendant filed a timely motion for a new trial. The trial court denied this motion on July 14, 2022, and the Defendant filed a timely notice to appeal four days later.

**ANALYSIS**

On appeal, the Defendant argues that the trial court committed several evidentiary errors, including by admitting evidence that (1) the victim made statements to her sister and best friend as excited utterances; (2) he told officers they needed a warrant to enter the house and that he was on his way to his attorney's office; (3) he had prior convictions for purposes of impeachment; and (4) he removed his GPS monitoring bracelet and left the jurisdiction while on pretrial release. The Defendant also asserts that the trial court erred in instructing the jury regarding flight and that the cumulative effect of the trial errors entitles him to a new trial. Finally, he asserts that the trial court erred in imposing consecutive sentences.

We address each of these issues in turn.

## A.   VICTIM'S STATEMENTS

As his first issue, the Defendant argues that the trial court erred by allowing the State to introduce the victim's statements to her friend and her sister that the Defendant raped her under the excited utterance exception to the prohibition against hearsay. He asserts that the victim could not have been operating under the stress of the startling event when she made the statements because too much time had elapsed. The State maintains that the trial court correctly admitted the statements as excited utterances. We agree with the State.

### 1.   Standard of Appellate Review

Our supreme court has recognized that "the first question for a reviewing court on any issue is 'what is the appropriate standard of review?'" *State v. Enix*, 653 S.W.3d 692, 698 (Tenn. 2022). The principal issue here is whether the trial court properly admitted hearsay evidence pursuant to Tennessee Rule of Evidence 803(2), also known as the excited utterance exception to the hearsay rule.

Typically, we review questions involving the admission of evidence for an abuse of discretion. *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014) ("We generally review evidentiary rulings under an 'abuse of discretion' standard."). However, our review of a hearsay issue is governed by different standards. In that context, "[t]rial courts must

conduct layered inquiries when determining the admissibility of evidence objected to on the grounds of hearsay," *State v. Jones*, 568 S.W.3d 101, 128 (Tenn. 2019), and the standard of appellate review varies accordingly. As our supreme court has recognized,

> Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule— are questions of law subject to de novo review.

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015) (citations omitted).

### 2.      Background

To give context to this issue, we note that after the victim testified at trial, the State announced that it would call the victim's friend as a witness. The State asserted that it sought admission of the victim's statement to her friend as an excited utterance.

During a jury-out hearing, the friend testified that she spoke with the victim through a video chat application on the night of September 2, 2019. During the conversation, the victim was "breaking down," scared, and crying. The friend asked what was wrong, but the victim was initially too afraid to tell her. After a minute, she told her friend that her "stepdad" had raped her. The friend was shocked and told the victim to tell her sister.

The State argued that the victim was still under the stress of the rape when the statement was made and that the statement related to the rape. The trial court agreed, finding that the disclosure did not need to be immediate. The court also made specific factual findings that the victim was under the stress of the startling event and that the statement was about the startling event.

The Defendant also objected to the sister's testimony, again arguing that the victim's statement to her did not constitute an excited utterance. In a separate jury-out hearing, the sister testified that on the night of September 2, 2019, she walked past the victim's bedroom and heard the victim crying. Because the door was open, the sister also heard the friend's voice on the phone saying, "[Y]ou have to tell somebody." The sister went into the victim's

room and asked what happened. The victim said that the Defendant had raped her. The victim cried and hugged her sister throughout their conversation. After this testimony, the trial court held that it would "rule consistently" with the statement made to the victim's friend, and it found that the victim's statement to her sister was also admissible as an excited utterance.

### 3.  Excited Utterance Exception to the Hearsay Rule

As defined by our Rules of Evidence, a hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). No party disputes that the victim's statements to her friend and sister were each subject to the hearsay rules. The victim's statements about the Defendant's actions were made out-of-court, and the State offered them for their truth. Indeed, the victim's statements about the Defendant had relevance only to the extent that they were true. *See* Tenn. R. Evid. 801(c); *State v. Padgett*, No. E2018-00447-CCA-R3-CD, 2019 WL 2233890, at *7 (Tenn. Crim. App. May 23, 2019), *no perm. app. filed*. As such, on our de novo review of whether the statements were hearsay, we conclude that the statements were properly subject to a hearsay objection.

While hearsay is generally inadmissible at trial, *see* Tenn. R. Evid. 802, the Rules of Evidence contain several exceptions to this general principle. "The effect of these exceptions is to admit some types of hearsay evidence even though the out-of-court statements were not made under oath and are not subject to cross-examination at trial." *State v. McGill*, No. M2022-00501-CCA-R3-CD, 2023 WL 2033804, at *4 (Tenn. Crim. App. Feb. 16, 2023) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298-99 (1973)), *no perm. app. filed*. In other words, despite the general prohibition on receiving hearsay evidence at trial, some hearsay statements are nevertheless admissible if "they fall within one of the evidentiary exceptions or some other law renders them admissible." *State v. Perry*, No. M2020-01407-CCA-R3-CD, 2022 WL 1195311, at *4 (Tenn. Crim. App. Apr. 22, 2022), *perm. app. denied* (Tenn. Nov. 16, 2022).

As one exception to the hearsay rule, our Rules of Evidence allow the admission of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 802(2). This exception is often referred to as the "excited utterance" exception, and the theory behind this hearsay exception is that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." *State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010).

To that end, three requirements must be satisfied before hearsay evidence may be admitted under this exception. First, there must be "a startling event or condition that

suspend[s] the normal, reflective thought processes of the declarant." *Id.* (citation and internal quotation marks omitted). "While any event deemed startling may be sufficient to meet this requirement, the event must be sufficiently startling to suspend the normal, reflective thought process of the declarant." *Kendrick*, 454 S.W.3d at 478 (internal quotation marks omitted). Additionally, "a subsequent startling event or condition which is related to the prior event can also produce an excited utterance." *Id.* (internal quotation marks and citation omitted).

Second, the statement "must relate to the startling event or condition." *Franklin*, 308 S.W.3d at 823 (internal quotation marks and citation omitted). "This broad requirement offers considerable leeway such that the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." *Id.* (internal quotation marks and citations omitted).

Finally, the statement must be made while the declarant is "under the stress or excitement from the event or condition." *Id.* (citation and internal quotation marks omitted). This third element looks at factors that suggest "spontaneity" in the statement and have a "logical relation" to the event. *Kendrick*, 454 S.W.3d at 478. Thus, a court may reflect upon the following considerations in assessing the applicability of this third element, including the following:

- the interval or time elapsed between the startling event and the statement;

- the nature and seriousness of the startling event or condition;

- the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and

- the contents and substance of the statement, which may indicate the presence or absence of stress.

*See State v. Banks*, 271 S.W.3d 90, 117 (Tenn. 2008); *Franklin*, 308 S.W.3d at 823 n.27.

### a.    Victim's Statement to Her Friend

First addressing the victim's statement to her friend, no dispute exists that the first two requirements for admission of this statement are met. This Court has previously held that rape is a "startling event or condition" for purposes of the excited utterance exception. *State v. Person*, 781 S.W.2d 868, 872 (Tenn. Crim. App. 1989) ("Rape is an occurrence or an event sufficiently startling to render inoperative the normal reflective thought processes

of an observer." (citation and internal quotation marks omitted)); *State v. Samuel*, 243 S.W.3d 592, 600-01 (Tenn. Crim. App. 2007) ("[T]he defendant coming into the victim's room, pulling her pants down, and vaginally penetrating her would certainly be a startling event."). In addition, the trial court found that the victim's statement related to this startling event, and the record fully supports this factual finding.

The Defendant's challenge is to the third requirement, *i.e.*, that the victim made the statement while still under the stress or excitement of the event or condition. The Defendant argues that "the State failed to meet its burden, as the proponent of the evidence, of establishing that the circumstances were such that [the victim] was still under the initial excitement of that event and thus to eliminate the possibility of deliberation and fabrication." He also asserts that "if there is an intervening time period of calm, rather than continuous stress, then that provides an opportunity for deliberation or fabrication." The State responds that the victim was still visibly upset when she made her disclosure to her friend.

Important to our standard of review, the question of whether the victim made a statement while still under the stress or excitement of the startling event or condition is a question of fact. *See State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (recognizing that "[t]he application of some [hearsay] exceptions may initially depend upon factual determinations," and identifying the factual determinations in Rule 803(2) to include "whether the statement 'relat[ed] to a startling event' or was 'made while the declarant was under the stress of excitement caused by the event'"). In this case, the trial court made a specific factual finding that the victim "was, in fact, under the stress and excitement of the event that had occurred the previous evening" when she uttered the statement to her friend. As such, we are bound by this factual finding unless the evidence in the record preponderates otherwise.

In our review of the record, however, the evidence supports the trial court's factual finding. As noted above, this third element looks to factors that suggest "spontaneity" in the statement and have a "logical relation" to the event. *Kendrick*, 454 S.W.3d at 478. The nature and seriousness of the rape as a startling event was significant, and its physical and emotional impact on the eleven-year-old victim would have been substantial. *Cf. State v. Ramos*, 331 S.W.3d 408, 415 (Tenn. Crim. App. 2010) (admitting statements, in part, when the victim "would still have been under emotional and even physical stress from the rape."). In addition, the Defendant had threatened physical harm to the victim's mother if the victim revealed what had happened.

As to the victim's appearance, behavior, outlook, and circumstances, the friend could see the victim over the video chat, and she noted that the victim was in tears and crying throughout the conversation, which was unusual for the victim. The friend testified that she could see that the victim was "breaking down really bad" and was "scared" to tell

her friend what was wrong. Indeed, the contents of the victim's statement indicated stress, as the victim said that she was terrified to tell someone about the rape.

The heart of the Defendant's complaint is that admitting the victim's statement to her friend violates the "temporal limits" of the excited utterance exception. While the time elapsed between the statement and the startling event is important, it is not dispositive. Indeed, "[t]he time interval is material only as a circumstance bearing on the issue of continuing stress." *Banks*, 271 S.W.3d 117 (citation and internal quotation marks omitted). To that end, our supreme court has recognized that a spontaneous response can occur as much as twelve hours after an event, particularly when the declarant is still in a state of shock. *See State v. Stout*, 46 S.W.3d 689, 700 (Tenn. 2001); *see also State v. F.R.*, 34 N.E.3d 498, 507 (Ohio Ct. App. 2015) (admitting an excited utterance from a minor made 24 hours after a rape and noting that "[t]he focus is not on a specific time frame but upon whether the excitement of the assault is still dominant over the child declarant's thought processes and whether the child's statements were unreflective expressions of her belief." (citation omitted)).

The record is not clear as to the time interval other than to establish that the rape occurred in the early morning and the disclosure occurred later that evening on the same day. However, given the nature and seriousness of the event, as well as the appearance and condition of the victim, the time interval does not preclude the possibility that the victim was still under the continuing stress of the rape. In other words, although the time elapsed is important to this analysis, it is not by itself so significant to overcome all other evidence supporting this third factor.

We acknowledge that the temporal factor makes this question closer than it may be in other cases. However, in the hearsay context, our standard of review binds us to the trial court's factual findings when they are supported by a preponderance of the evidence. *Kendrick*, 454 S.W.3d at 479. Here, the trial court made a specific factual finding that the victim's statement was made while "under the stress and excitement of the event that had occurred the previous evening." In making this finding, the court carefully considered the relevant factors, including the time between the startling event and the making of the statement, in ruling on this close issue. From our examination of the record, the trial court's finding is supported by a preponderance of the evidence. Deferring to this factual finding, therefore, we conclude on our de novo review that the victim's statement to her friend fell within the excited utterance exception to the hearsay rule and was admissible at trial.

b.      **Victim's Statement to Her Sister**

The admissibility of the victim's statement to her sister is also a close question. As we noted earlier, the rape was a startling event, and the statement related to the startling

event. Approximately twelve hours following the startling event, the victim contacted her friend by video chat and told her about the rape. During that conversation, the victim was upset, breaking down, crying, and scared. The sister overheard the victim crying and asked the victim what was wrong. The victim responded that the Defendant had raped her.

"[S]tatements made in response to questions may still be admissible if the declarant is under the excitement or stress of the event." *State v. Gordon*, 952 S.W.2d 817, 820-21 (Tenn. 1997); Neil P. Cohen et al., *Tennessee Law of Evidence*, § 8.07[3][d] (6th ed. 2011) ("The fact that a question prompted the excited answer is a circumstance relevant to stress, but it does not automatically bar the statement's admission under Rule 803(2)."). In this case, the trial court stated that it would "rule consistently" with its previous holding and admit the evidence under the excited utterance exception. The previous holding included a factual finding that the victim was still acting under the stress of the rape when she made the statements, and, in the context of the victim's statement to the sister, this finding is supported by a preponderance of the evidence. Again deferring to this factual finding, as we must, we conclude on our de novo review that the victim's statement to her sister fell within the excited utterance exception and was admissible at trial. The Defendant is not entitled to relief on this ground.

## B.    DEFENDANT'S STATEMENTS

The Defendant next argues that the trial court erred by allowing the State to introduce statements he made in asserting various constitutional rights. More specifically, the Defendant objected to evidence that he told law enforcement officers at the victim's house that they needed a warrant, ostensibly to enter the residence. He also objected to evidence that he told these officers he was "headed to [his] lawyer's office" when they asked where he was. We agree that both statements should not have been admitted, though any error is harmless beyond a reasonable doubt.

### 1.    Background

As background for these issues, officers were dispatched to the victim's house while the victim and her mother were still at the hospital. The officers were sent to collect possible evidence and contact the Defendant. When the officers arrived about 11:00 p.m. that night, they encountered the Defendant's son. The Defendant and his son were on a video chat, and through this medium, the Defendant told the police, "You have to have a warrant" to enter the house. The officers also interrupted the conversation between the Defendant and his son to ask about the Defendant's location. The Defendant responded, "I'm headed to my lawyer's office. What's going on?" An officer's body camera captured both statements.

The Defendant objected to this evidence, arguing "that it is generally irrelevant that somebody has asserted a Constitutional Right if – if for the reason the State's offering it is for the jury to draw an inference of guilt." Defense counsel acknowledged that if the State sought to introduce such proof for another reason, "we would have to meet that when it [comes] up[.]" Although the State responded that the Defendant's statements were relevant to the destruction of evidence and his flight, the Defendant disagreed. He argued that the jury would infer that he was guilty because he wanted to speak to a lawyer. Defense counsel also asserted that the Defendant's demand for a warrant was irrelevant to the flight issue.

After taking the matter under advisement, the trial court allowed the State to introduce the unredacted body camera footage with both statements by the Defendant. The court acknowledged the difficulty of the questions but believed that the statement, "You have to have a warrant," was not necessarily "an invocation of any constitutional rights." The court also believed that, when viewed in the context in which it was made, the Defendant's statement about going to see his lawyer was evidence of his evasion of police and relevant to flight.

### 2. Defendant's Refusal to Consent to Search

The Defendant first argues that the trial court erred in admitting his statement that the officers needed a warrant to enter the house. He asserts that the introduction of his statement was a comment upon him exercising a right guaranteed by the Constitution. The State, essentially conceding the error, responds that any error committed by the trial court was harmless. We agree that the admission of this statement was harmless error.

Our courts in Tennessee have not directly addressed this issue. The supreme court has recognized that "[t]here is authority that the refusal of an accused to consent to a search without a warrant may not be used against him to imply guilt." *State v. Johnson*, 743 S.W.2d 154, 159 (Tenn. 1987). However, although the *Johnson* Court did not discuss the principle in detail, it allowed this type of evidence when offered for other "relevant and admissible" purposes, such as refuting the notion that the defendant "was cooperating voluntarily with investigating authorities." *Id.*

Nevertheless, other courts have held that a defendant's "exercise of a constitutional right, whether to *refuse to consent to a search*, to refuse to waive *Miranda* rights or to decline to testify at trial, is not evidence of guilt." *United States v. Clariot*, 655 F.3d 550, 555 (6th Cir. 2011) (emphasis added); *see United States v. Thame*, 846 F.2d 200, 206 (3d Cir. 1988) ("We also see little, if any, valid distinction between the privilege against self-incrimination and the privilege against unreasonable searches and seizures which is relevant to the propriety of the prosecutor's argument."). In fact, "asking a jury to draw

adverse inferences from [a refusal to consent to search] may be impermissible if the testimony is not admitted as a fair response to a claim by the defendant or for some other proper purpose." *United States v. Dozal*, 173 F.3d 787, 794 (10th Cir. 1999); *United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir. 1978) ("Just as a criminal suspect may validly invoke his Fifth Amendment privilege in an effort to shield himself from criminal liability, so one may withhold consent to a warrantless search, even though one's purpose be to conceal evidence of wrongdoing." (citations and footnote omitted)). Moreover, while refusing to consent to a warrantless search "is equally available to the innocent and the guilty," a prosecutor's introduction of the refusal "can have but one objective[:] to induce the jury to infer guilt." *Prescott*, 581 F.2d at 1352.

On appeal, the State does not argue that it asked the trial court to admit the Defendant's insistence upon a search warrant for any purpose other than to establish his guilt. From our review of the record, the evidence was not relevant to a flight issue, and we can discern no "relevant and admissible" purpose for admitting the Defendant's insistence upon a search warrant other than to imply his guilt. *Johnson*, 743 S.W.2d at 159. Even under the deferential standard of review, we respectfully conclude that this evidence should not have been admitted.

That said, admission of this type of evidence does not result in automatic reversal of the conviction. Our supreme court has stated that "non-structural constitutional errors do not require automatic reversal and are, therefore, subject to a harmless error analysis." *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). To avoid reversal, the State bears the burden of "demonstrat[ing] beyond a reasonable doubt that the error is harmless." *Id.* "The test used to determine whether a non-structural constitutional error is harmless is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (internal quotation marks and citations omitted).

In this case, although the State referred to the Defendant's insistence upon a search warrant on three occasions, it did not try to convince the jury to attribute any particular significance to the statement. More importantly, the State's proof of the Defendant's guilt was overwhelming. The victim gave detailed testimony about the rapes, and she definitively identified the Defendant as her rapist. DNA consistent with the Defendant's genetic profile was found inside and outside the victim's vagina.

After seeing the police speaking with the victim at a local convenience store, the Defendant called his son and instructed him to wash the victim's bedding, which destroyed potential evidence of the rapes. Even though the Defendant claims his son was responsible, multiple witnesses, including the victim, her mother, her sister, and the Defendant's son, all testified that the Defendant's son was not in the house at the time of the offenses. The Defendant fled from the scene, did not tell anyone where he was, and did not return. The Defendant later sent the victim's mother messages of remorse and said that she did not

- 13 -

"deserve any of this," that he could not "change it," and that he deserved to die. In our view, it appears beyond a reasonable doubt that the evidence did not contribute to the verdict. As such, we conclude that the error was harmless beyond a reasonable doubt.

### 3.     Defendant's Consultation with a Lawyer

The Defendant next argues that the trial court abused its discretion by allowing the State to admit the statement that he was on his way to his attorney's office. The State responds that the Defendant's statement, "I'm headed to my lawyer's office," was not an invocation of his right to counsel. It asserts that the statement was not credible because it was made at 11:00 p.m. when most lawyers' offices were closed. It also argues that the statement was circumstantial evidence of the Defendant's flight when combined with his leaving the house after the victim disclosed the rape, abandoning the victim's mother's car in an unfamiliar neighborhood, and staying with a friend. We agree with the Defendant but conclude the error was harmless beyond a reasonable doubt.

### a.     Danger of Improper Inference of Guilt

Although the issue has not been directly addressed in Tennessee, other courts have held that a prosecutor may not refer to a defendant's decision to meet with counsel, at least to imply that the defendant is guilty. *See, e.g.*, *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990) ("A prosecutor may not imply that an accused's decision to meet with counsel, even shortly after the incident giving rise to a criminal indictment, implies guilt."). When a defendant seeks a meeting with legal counsel before the initiation of formal charges or custodial interrogation, courts have recognized that the Due Process Clause of the Fourteenth Amendment prohibits the State's discussion of this fact at trial. *See Commonwealth v. Nolin*, 859 N.E.2d 843, 856 (Mass. 2007); *State v. Dixon*, 112 P.3d 883, 904 (Kan. 2005), *disapproved of on other grounds by State v. Wright*, 224 P.3d 1159 (Kan. 2010). The reason for this prohibition is simple: this evidence "is likely to give rise to the improper inference that a defendant in a criminal case is, or at least believes himself to be, guilty" because "he had done something for which he needed a lawyer to defend him." *State v. Angel T.*, 973 A.2d 1207, 1221 (Conn. 2009); *Martin v. State*, 775 A.2d 385, 394 (Md. 2001) ("Evidence of a criminal defendant's consultation with an attorney is highly prejudicial, as it is likely to give rise to the improper inference that a defendant in a criminal case is, or at least believes himself to be, guilty.").

For these reasons, the State must tread carefully before seeking admission of any evidence that the accused sought legal advice or tried to meet with a lawyer before charges are brought. However, the prohibition is not absolute. Where evidence of a legal consultation is relevant to a material issue at trial, and where the jury is properly instructed on how to consider the evidence, rare cases may exist where the evidence is admissible.

*See United States v. Frazier*, 944 F.2d 820, 826 (11th Cir. 1991) ("Prosecutors may not use the simple fact of representation by counsel to imply a defendant is guilty; but when the defendant's particular choice of counsel is relevant to an issue (such as, means or motive) in dispute, defense counsel is not exempt from being talked about at trial."); *Sulie v. Duckworth*, 689 F.2d 128, 130 (7th Cir. 1982) (allowing statements against a Fifth Amendment challenge as bearing on the issue of sanity).

But this is not one of those rare cases. "In order for evidence to be admissible, it must be relevant." *State v. Tolliver*, No. W2021-01386-CCA-R3-CD, 2023 WL 2673152, at *13 (Tenn. Crim. App. Mar. 29, 2023), *perm. app. denied* (Tenn. Aug. 8, 2023). The Rules of Evidence provide that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

The State argues here that the Defendant's statement that he could not meet with law enforcement officers because he was "headed to [his] lawyer's office" was relevant to the issue of flight. The State asserts that it was highly unlikely that the Defendant was going to see his lawyer at 11:00 at night, particularly because he had abandoned the mother's vehicle around the same time. According to the State, he lied to the police to avoid disclosing his location, and this evasion, when coupled with his leaving the crime scene, arguably constituted flight.

In the context of this line of questioning, the operative and relevant fact to the flight issue was the Defendant's refusal to disclose his location when asked by the officers. It was his evasion and subsequent hiding out at his friend's house that were important to the flight argument. The fact that he mentioned seeing a lawyer as a basis for his refusal to disclose his location possessed no probative value at all. The statement filled no material gaps in the story, and it did not make any fact of consequence more probable than it would have been without the evidence. The Defendant's statement was simply irrelevant. Tenn. R. Evid. 401, 402; *see also Martin*, 775 A.2d at 393 ("[T]he fact to be inferred—the consciousness of guilt—is not made more probable (or less probable) from the mere seeking of legal advice or representation, and so evidence of the predicate fact is simply irrelevant. On pure evidentiary grounds, it is inadmissible.").

Even if the relevant inference were that the Defendant lied to the police officers about why he could not meet with them, the State's argument would fare no better. The false information that he was meeting with someone else could have been elicited without ever mentioning the Defendant's stated desire to meet with a lawyer. In other words, that the Defendant falsely represented that he was on his way to meet someone was the operative fact, not that he was meeting specifically with a lawyer. Again, the Defendant's statement about meeting a lawyer specifically was simply irrelevant. Tenn. R. Evid. 401, 402.

Indeed, the record itself clearly demonstrates the irrelevance of the Defendant's statement about seeing a lawyer. Despite arguing emphatically to the trial court that the information was relevant to the Defendant's flight, the State did no such thing with the jury. The State never argued to the jury that the Defendant's statement about seeing a lawyer was offered as evidence of flight.[2] It did not ask its witnesses if they confirmed the Defendant's supposed meeting, and it did not seek or propose a jury instruction to guide the jury's consideration of the evidence. In essence, the jury was left without any proper guidance about how to consider and evaluate the evidence.

This is a significant concern. We remain

> mindful that [m]ost jurors . . . are not schooled in the law and that from such evidence and arguments, a juror might easily draw the inference . . . that it was [the defendant's] idea to seek counsel because he had done something for which he needed a lawyer to defend him. Accordingly, we view [e]vidence of a criminal defendant's consultation with an attorney [as] highly prejudicial, as it is likely to give rise to the improper inference that a defendant in a criminal case is, or at least believes himself to be, guilty.

*Angel T.*, 973 A.2d at 1221; *see also Sizemore*, 921 F.2d at 672 ("This repeated failure to caution the jury and counsel not only failed to cure the errors made, but was bound to imply that the right to counsel was of little or no consequence and that exercise of that right was somehow indicative of guilt."); *Lane v. State*, 327 So. 3d 691, 753 (Ala. Crim. App. 2020) ("[T]he question is whether the State relied on the simple fact of representation by counsel to imply [the] defendant is guilty, *i.e.*, whether that is the unavoidable inference from such references, or whether the specific facts and circumstances of the case indicate that such references served a legitimate purpose tied to relevant issues in the case." (citation and internal quotation marks omitted)). Based upon the foregoing, we conclude that the State should not have played the portion of the video on which the Defendant stated he was on his way to his attorney's office.

### b. Effect of the Error

Virtually all courts addressing the erroneous admission of a defendant's consultation with a lawyer have held that the error is subject to some heightened harmless error analysis. In other words, while the error is not one where automatic reversal is

---

[2] The trial court was naturally concerned that the State not exceed the leeway given, and it warned the State about putting "a whole lot of argument" on the statement. The State apparently took heed of the caution and opted to place no emphasis on the Defendant's comment.

required,[3] courts routinely hold that, given the nature of the constitutional right at issue, the error requires proof of harmlessness beyond a reasonable doubt. *See, e.g., United States ex rel. Macon v. Yeager*, 476 F.2d 613, 616 (3d Cir. 1973); *Angel T.*, 973 A.2d at 1223; *State v. Marshall*, 586 A.2d 85, 149 (N.J. 1991) (surveying cases). We agree with these courts that the erroneous admission of a defendant's consultation with a lawyer is a non-structural constitutional error. As such, the presence of this error requires a new trial unless the State demonstrates "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (internal quotation marks and citations omitted).

We conclude that this error was harmless beyond a reasonable doubt. First, as noted above, the State's case was strong, and evidence of the Defendant's guilt was overwhelming. Moreover, the Defendant's statement was isolated and not highlighted by the State later in the trial or during argument. The State did not mention the comment during its case-in-chief other than playing the statement once through the officer's body camera video, nor did it discuss the Defendant's statement during closing arguments. Thus, while the jury was left with an inference of guilt, the State did not compound the error by making an argument supporting this theory. This slight reliance on the evidence by the State significantly minimizes the effect of the error. *See United States v. Daoud*, 741 F.2d 478, 482 (1st Cir. 1984) (finding error harmless beyond a reasonable doubt when "the prosecutor never made a point of asking the jury to draw a negative inference from the defendant's exercise of a constitutional right" and when "[t]he matter was not pursued in argument"). Accordingly, given the strength of the State's case and the isolated reference by the State, we conclude that the error was harmless beyond a reasonable doubt.

## C.     IMPEACHMENT WITH PRIOR CONVICTIONS

The Defendant next argues that the trial court erred by allowing the State to impeach him with two federal convictions for conspiracy to distribute and possess methamphetamine and possession of a firearm in relation to drug trafficking because the convictions were over ten years old and "did not speak directly to honesty." In response, the State maintains that the trial court acted within its discretion when it admitted the prior convictions. Alternatively, the State asserts that the Defendant "cannot show that

---

[3]     The Defendant cites *United States v. McDonald*, 620 F.2d 559 (5th Cir. 1980) to argue that the State's error is a structural constitutional error requiring automatic reversal. We do not believe that *McDonald* compels this conclusion. Indeed, only two years later, the Fifth Circuit distinguished *McDonald* on its facts and held that an instruction from the trial court could help cure an erroneous reference to a defendant's retention of counsel. *United States v. Milstead*, 671 F.2d 950, 953 (5th Cir. 1982); *see also Marshall*, 586 A.2d at 148-49 ("Although the Fifth Circuit in *McDonald* considered the error to be harmful per se, the same Court of Appeals applied a harmless-error analysis in *Milstead*.").

admission of his prior convictions more likely than not affected the verdict."  We again agree with the State.

### 1.    Background

As background for this issue, we note that after the State's proof, the Defendant made a motion for judgments of acquittal, which the trial court denied.  The State then said that it had given notice that it would impeach the Defendant with three prior convictions should the Defendant testify.  Two of these convictions were federal felony convictions occurring on May 23, 2005, consisting of conspiracy to distribute and possess more than 50 grams of methamphetamine and possession of a firearm in relation to drug trafficking.[4]

The trial court ruled that the State could use the state marijuana conviction for impeachment purposes.  Addressing the 2005 federal convictions, the court treated them as if they were outside the ten-year time limitation without making a specific finding.  However, the trial court also found that the probative value of the convictions substantially outweighed their prejudicial effect.  In so doing, the trial court acknowledged that the federal convictions did not have "an element of specific dishonesty."  However, it also reasoned that witness credibility was an important issue, and it observed that the seriousness of the convictions "could help the jury in determining credibility."  The trial court also concluded that "the fact that he's got prior felony convictions and it's not just one of selling marijuana, that it's something more serious, I think, could help the jury in determining credibility."  Accordingly, the trial court allowed the State to impeach the Defendant with his prior federal convictions as well.

### 2.    Standard of Appellate Review

"We review a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard."  *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003).  "A trial court abuses its discretion when it applies an incorrect

---

[4]    The third conviction was a state felony conviction for possession of marijuana occurring on April 8, 2016.  Because the Defendant does not challenge the admissibility of this conviction for impeachment purposes, we do not address it further.  *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review.").

legal standard or reaches a decision that is against logic or reasoning that causes an injustice to the party complaining." *State v. Russell*, 382 S.W.3d 312, 317 (Tenn. 2012).

### 3.     Tennessee Rule of Evidence 609

Tennessee Rule of Evidence 609(a)(2) provides that a witness's credibility may be impeached by evidence of a conviction of crimes "punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement." To explain the distinction between the two categories, this Court has previously stated that "[t]o be *eligible* as an impeaching conviction, a prior *felony* conviction need not involve dishonesty." *State v. Osborne*, 251 S.W.3d 1, 22 (Tenn. Crim. App. 2007) (internal quotation marks and citation omitted, emphasis in original). In the instant case, the parties do not dispute that each of the Defendant's prior federal convictions were felonies as defined in Rule 609(a)(2).

The admission of prior felonies for impeachment purposes, however, is governed by different standards depending on when the felonies were committed in relation to the current charges. For example, while a defendant's prior conviction is not typically admissible unless the trial court finds that "the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues," Tenn. R. Evid. 609(a)(3), a different standard applies to older convictions. Thus, when more than ten years have elapsed since the date the defendant was released from confinement, or if the defendant was not confined, the date of conviction, a heightened standard applies. In that circumstance, the prior conviction is admissible only when, among other things, "the court determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, *substantially outweighs* its prejudicial effect." Tenn. R. Evid. 609(b) (emphasis added).

"The underlying theory [behind the ten-year rule] is that a person's criminal deeds long ago may have little bearing on the person's credibility today. The individual may have matured considerably and learned from the experiences engendered by the conviction." *State v. Chism*, No. W2002-01887-CCA-R3-CD, 2003 WL 23100335, at *6 (Tenn. Crim. App. Dec. 23, 2003) (citation and internal quotation marks omitted), *perm. app. dismissed* (Tenn. Mar. 18, 2004). "Thus, as a practical matter, the balancing test required by Tenn. R. Evid. 609(b) ordinarily results in the exclusion of the evidence of the stale conviction." *Ingram v. Earthman*, 993 S.W.2d 611, 639 (Tenn. Ct. App. 1998); *see State v. Smith*, No. 910, 1990 WL 157419, at *4 (Tenn. Crim. App. Oct. 19, 1990) ("Rule 609(b) creates, in effect, a rebuttable presumption that convictions over ten years old are more prejudicial than helpful and should be excluded.").

In this case, it is unclear from the record whether ten years had elapsed between the Defendant's release from federal custody and the commencement of the present charges. At trial, the parties were equivocal on this point, and as such, the trial court appears to have applied the more rigorous standard of admissibility under Rule 609(b) from a sense of fairness to the Defendant. As such, we also review the trial court's decision to admit the prior federal convictions for impeachment purposes under that standard as well.

In analyzing the admissibility of prior convictions for impeachment, a trial court is "required to determine and explain the relevance of the convictions to the issue of credibility and to assess the similarity between the present offenses and the impeaching convictions." *State v. Williamson*, No. W2019-00437-CCA-R3-CD, 2020 WL 1274770, at *5 (Tenn. Crim. App. Mar. 16, 2020), *perm. app. denied* (Tenn. Nov. 17, 2020). Importantly, while a felony crime "need not involve dishonesty" to be admissible for impeachment, our supreme court has "rejected a per se rule that permits impeachment by any and all felony convictions." *Waller*, 118 S.W.3d at 371. Instead, "[a] prior felony conviction still must be analyzed to determine whether it is sufficiently probative of credibility to outweigh any unfair prejudicial effect it may have on the substantive issues of the case." *Id.* "To determine how probative a felony conviction is to the issue of credibility, the trial court must assess whether the felony offense involves dishonesty or false statement." *Id.* The court "must focus particular attention on: (1) the relevance of the impeaching conviction to the issue of credibility; and (2) the similarity between the charged offense and the impeaching conviction." *State v. Herron*, 461 S.W.3d 890, 906 (Tenn. 2015).

With respect to other types of possession offenses, our supreme court has recognized that these offenses "do not involve dishonesty or false statement." *Waller*, 118 S.W.3d at 372 (in the context of drug possession offenses). But the supreme court has stopped short of holding that convictions for possession offenses are never admissible for impeachment, and it has recognized that they can be "slightly probative of [a defendant's] credibility." *Id.* at 373. Moreover, the court has expressly recognized the possibility that a greater number of impeaching convictions "are more probative of credibility than a lesser number would be[.]" *Id.*; *see also State v. Walker*, 29 S.W.3d 885, 891 (Tenn. Crim. App. 1999) (stating that "five previous felony convictions are more probative on the issue of the defendant's credibility than would be a fewer amount").[5] Indeed, we have also recognized that the probative value of an impeaching conviction increases when the credibility of the accused is "the sole or primary issue." *State v. Bowen*, No. W2015-01316-CCA-R3-CD,

---

[5] Of course, where the impeaching offenses are of the same type as the currently charged offense, a greater number of impeaching offenses "increases the risk that the jury would improperly consider the impeaching convictions as evidence of his propensity to commit the present offense." *Waller*, 118 S.W.3d 373. Such is not the case here.

2016 WL 6776348, at *5 (Tenn. Crim. App. Nov. 15, 2016), *perm. app. denied* (Tenn. Mar. 9, 2017).

Although the Defendant argues strongly that the federal convictions were inadmissible for impeachment, the standard of appellate review is important to our analysis. When reviewing a trial court's decision for an abuse of discretion, we must have "awareness that the decision being reviewed involved a choice among several acceptable alternatives." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). To that end, we may not "second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that [we] would not have chosen." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019). We also may not substitute our judgment for that of the trial court simply because we believe that another choice would have been the "best decision." *State v. Willis*, 496 S.W.3d 653, 729 (Tenn. 2016).

Instead, under this deferential standard of review, we look first to see whether the trial court identified and applied the correct legal standard. *McCaleb*, 582 S.W.3d at 198. Next, we consider whether the trial court made a decision that took into account the applicable law and the relevant facts. *Lee Med., Inc.*, 312 S.W.3d at 524. We then examine whether the trial court's decision "was within the range of acceptable alternative dispositions." *Id.* Importantly, while "[a]ppellate courts have the task of articulating the boundaries of the permissible range of the trial court's options," the choice among alternatives within that range is left to the trial court. *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 306 (Tenn. 2020).

In this case, the trial court acted within its discretion in admitting evidence of the Defendant's federal convictions for impeachment purposes. For example, the court first identified the correct standards of law that applied to the analysis of older convictions under Rule 609(b). Next, it examined the totality of the facts and circumstances in making its decision. While the convictions were not crimes involving dishonesty, the court found that they still possessed some probative value on the issue of credibility. The trial court considered that multiple convictions were more probative of credibility than a single conviction, and it found that the Defendant's own credibility was an important issue given that the DNA evidence was consistent with two individuals. Finally, the trial court determined that the prior federal convictions and the instant charges were dissimilar, which minimized the risk of the jury inferring that the Defendant had a propensity to commit the instant crime. *See State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

Based on these findings, the trial court expressly held that the probative value of the federal convictions on the issue of credibility substantially outweighed the danger of unfair prejudice and that admission of the convictions for impeachment was in the interests of justice supported by specific facts and circumstances. Although it is possible that others could reach a different conclusion, the trial court's decision here was not illogical, nor was

it unreasonable.  To the contrary, the court identified and applied the correct standard of law, made findings that have support in the record, and made a reasoned choice between acceptable alternatives.  As such, because "reasonable minds can disagree with the propriety of the decision," we conclude that the trial court acted within its discretion to admit the Defendant's prior federal convictions for impeachment purposes.  *McCaleb*, 582 S.W.3d at 186.  The Defendant is not entitled to relief on this ground.

### D.  REMOVAL OF GPS MONITORING BRACELET

The Defendant argues that the trial court erred in allowing the State to introduce evidence that while he was on pretrial release, the Defendant cut off his GPS monitoring bracelet and left the jurisdiction but returned before trial.  The State responds that the Defendant waived this issue because he objected on a different basis at trial.  We agree with the State.

### 1.  Background

To provide context for this issue, we note that before cross-examining the Defendant, the State told the trial court that it wanted to ask about the Defendant's removing his GPS monitoring bracelet while he was on pretrial release.  The State said the question related to flight, especially because the Defendant did it after being charged. Defense counsel argued that no flight occurred because the Defendant told the authorities in advance and voluntarily returned to the jurisdiction.  The court disagreed and allowed the evidence for "consciousness of guilt on flight."

On cross-examination, the Defendant acknowledged that after his arrest, he was released on bond and was equipped with a GPS monitoring bracelet.  After that, he cut off the bracelet and left the jurisdiction.  On redirect examination, the Defendant said that before he cut off his GPS bracelet, he contacted the monitoring agency to tell them that he was leaving but would return.  After celebrating his fortieth birthday in Las Vegas, the Defendant returned to Tennessee.

### 2.  Admission of Evidence

The Defendant asserts that cutting off his GPS monitoring bracelet was "a violation of the terms of his release on bond that should have been analyzed under Rule 404(b)." The Defendant contends that the "trial court was thus required, before admitting the evidence, not only to identify the relevant issue but also to make a finding under a clear

and convincing evidence standard and to balance the unfair prejudice against the probative value."

However, as the State notes, the Defendant did not raise a 404(b) objection during the trial. *State v. Jones*, 151 S.W.3d 494, 498 n.3 (Tenn. 2004) ("[The defendant] did not request a 404(b) hearing at trial or in her motions before the trial court. Accordingly, we do not consider whether the evidence should have been excluded under Tennessee Rule of Evidence 404(b)."). At trial, the Defendant asserted only that cutting off his GPS monitoring bracelet was not evidence of flight because he voluntarily returned to the jurisdiction. In his amended motion for a new trial, the Defendant summarily stated the admission of the proof "was contrary to Rule 404(b) and Rule 403." The Defendant made no further argument on the issue at the hearing on the motion for a new trial.

Ordinarily, before a party can challenge the admission of evidence on appeal, the party must have preserved the issue in the trial court. To preserve an issue, the party should first assert a timely objection identifying a specific ground. The party then must later raise that issue in a motion for a new trial. Tenn. R. Evid. 103(a)(1); Tenn. R. Crim. P. 51(b); Tenn. R. App. P. 3(e). Otherwise, "the party waives the issue on appeal and cannot seek plenary review." *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *3 (Tenn. Crim. App. July 14, 2023) (citations omitted), *no perm. app. filed*.

It is well-established that "[w]hen a party abandons the ground asserted when the objection was made and asserts completely different grounds in the motion for a new trial and in [the appellate] court, the party waives the issue." *State v. Howard*, No. M2020-01053-CCA-R3-CD, 2021 WL 5918320, at *6 (Tenn. Crim. App. Dec. 15, 2021), *no perm. app. filed*. As an appellate court, our authority to decide cases generally extends only to those issues that have been "formulated and passed upon in some inferior tribunal." *State v. Bristol*, 654 S.W.3d 917, 925 (Tenn. 2022) (citation and internal quotation marks omitted). "Because the Defendant did not argue that the statements were inadmissible under Rule 404(b) or Rule 403 . . . , we have no ruling from the trial court regarding these rules to review, and we must conclude that these arguments are waived." *State v. DeMeza*, No. W2016-02086-CCA-R3-CD, 2018 WL 1040145, at *20 (Tenn. Crim. App. Feb. 21, 2018), *perm. app. denied* (Tenn. June 8, 2018).

Because the Defendant has waived plenary review of any Rule 404(b) objection in this Court, he may obtain relief, if at all, under the standards governing plain error review. Importantly, though, our authority to review unpreserved issues for plain error is discretionary, and our supreme court has emphasized that this authority is to be "sparingly exercised." *See State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007). Indeed, only "rarely will plain error review extend to an evidentiary issue." *State v. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007), *no perm. app. filed*.

In this case, the State argued that the Defendant waived this issue by failing to raise the objection he now advances.  However, while the Defendant filed a reply brief, he did not request plain error review therein or argue the factors that could justify such relief.  "To be clear, a party seeking plain error relief must generally raise and argue the issue in the party's briefing, just as the party would do with all other issues in the ordinary course of an appeal."  *State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *3 (Tenn. Crim. App. Oct. 30, 2023), *no perm. app. filed*.  As such, "where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief."  *Thompson*, 2023 WL 4552193, at *5.  We find no such circumstances here.  Accordingly, we respectfully decline to exercise our discretion to review the Defendant's issue under plain error review.  The Defendant is not entitled to relief.

### E.  FLIGHT INSTRUCTION

On appeal, the Defendant maintains that the trial court erred by giving the jury an instruction on flight, arguing that there was insufficient evidence to support the instruction.  The State responds that the trial court correctly instructed the jury.  We agree with the State.

A criminal defendant has a "right to a correct and complete charge of the law."  *State v. Hanson*, 279 S.W.3d 265, 280 (Tenn. 2009).  As such, "the trial court has the duty to give a comprehensive instruction of the law as applicable to the facts in each case[.]"  *Id.*  "Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness."  *State v. Smith*, 492 S.W.3d 224, 245 (Tenn. 2016).

This Court has observed that "[f]light or attempted flight may bear on the defendant's intent, purpose, or consciousness of guilt and may connect the accused with the commission of the offense."  *State v. Collins*, No. W2020-01566-CCA-R3-CD, 2022 WL 1183803, at *9 (Tenn. Crim. App. Apr. 21, 2022) (citing *Rogers v. State*, 455 S.W.2d 182, 186 (Tenn. Crim. App. 1970)), *no perm. app. filed*.  To that end, a trial court may instruct the jury that it may consider a defendant's flight if there "is proof of both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown."  *State v. Burns*, 979 S.W.2d 276, 289-90 (Tenn. 1998) (internal quotation marks and citation omitted) (emphasis omitted).

"The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction."  *Rogers*, 455 S.W.2d at 187 (internal quotation marks and citation

omitted). As such, "[e]ven a brief evasion of authorities can support the giving of the flight instruction," and no particular distance must be shown. *State v. Martin*, No. W2017-01610-CCA-R3-CD, 2018 WL 4677575, at *19 (Tenn. Crim. App. Sept. 28, 2018), *no perm. app. filed*.

Of course, a defendant's flight may be explained by reasons other than a guilty conscience. We have recognized that "[e]vidence of flight to avoid arrest may be rebutted by a credible explanation of some motive other than guilt, but the conclusion to be drawn from such evidence is for the jury upon proper instructions from the trial court." *Hall v. State*, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979). Nevertheless, "[a]ny contradictory evidence that serves to rebut the [S]tate's proof merely raises a question for the jury to resolve." *State v. Brazelton*, No. E2019-00992-CCA-R3-CD, 2021 WL 5878997, at *11 (Tenn. Crim. App. Dec. 13, 2021), *perm. app. denied* (Tenn. Apr. 13, 2022).

In our review of the record, the evidence fairly raised the issue of flight. After the victim disclosed the rape, she met with the police at a convenience store. Instead of accompanying the victim and her mother, the Defendant left the house in the mother's van, and he later left the van in front of a vacant house in an unfamiliar location. Upon learning the police were at the victim's house, he did not return home and instead had his son bring him clothes. The Defendant then stayed with a friend until his eventual arrest. In fact, the Defendant's testimony confirmed that he did not go home and instead went to his friend's house to avoid the police. Because these facts could support a finding that the Defendant was hiding out to evade or avoid a prosecution, sufficient evidence existed to support the instruction. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004) (appendix).

In addition, the flight instruction appears to have been taken from the Tennessee Pattern Jury Instructions, and it properly left to the jury the issue of whether the Defendant took flight. *Berry*, 141 S.W.3d at 588 ("This pattern jury instruction [on flight] is a correct statement of the applicable law and has been previously cited with approval by our court."). The instruction noted that "the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged," and it equally observed that "an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case." All things considered, the instruction given by the trial court was relatively benign. *State v. Wilks*, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *5 (Tenn. Crim. App. Nov. 22, 1999) (noting that a nearly identical instruction was "relatively benign" and rendered any error harmless), *perm. app. denied* (Tenn. May 9, 2000). We conclude that the trial court acted within its discretion in instructing the jury on the issue of flight.

## F.    CUMULATIVE TRIAL ERRORS

The Defendant argues that the cumulative impact of the errors in this case prevented him from receiving a fair trial. The cumulative error doctrine applies when there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To that end, more than one actual error must exist before the cumulative error doctrine can apply. *Id.* at 77.

In the instant case, we have concluded that the Defendant's statements that the police needed a warrant to enter the house and that he was on his way to his attorney's office should not have been admitted. Therefore, multiple errors exist in this case. However, our supreme court has explained that

> [a] reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the [State's] case. The run of the trial may also be important[.]

*Id.* (internal quotation marks and citation omitted) (alterations in original). Ultimately, "[b]ecause a defendant is not guaranteed a perfect trial, the circumstances warranting the reversal of a conviction under the cumulative error doctrine are rare." *State v. Reynolds*, 635 S.W.3d 893, 933 (Tenn. 2021).

We conclude that the errors committed "do not lend themselves to being aggregated to show that" the Defendant did not receive a fair trial. *Id.* The nature of the errors, the lack of any interrelation, and the other proof in the case do not show that this case is one of the rare cases where multiple errors should result in reversal. The Defendant is not entitled to relief due to cumulative error.

## G.    SENTENCING

Finally, the Defendant challenges the sentence imposed by the trial court. He does not take issue with the length of the sentences for his individual crimes. However, he argues that the trial court erred by imposing partial consecutive sentences. The State responds that the trial court properly exercised its discretion when it imposed partial consecutive sentences. We agree with the State.

The process of imposing discretionary consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b) involves two steps. First, the trial court must find by a preponderance of the evidence that "the defendant qualifies for consecutive sentencing under one of the classifications set forth in section 40-35-115(b)." *State v. Perry*, 656 S.W.3d 116, 127 (Tenn. 2022) (footnote omitted). Second, the trial court must "then choose whether, and to what degree, to impose consecutive sentencing based on the facts and circumstances of the case, bearing in mind the purposes and principles of sentencing." *Id.* "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *State v. Pollard*, 432 S.W.3d 851, 862 (Tenn. 2013) (citations omitted).

The trial court found that the Defendant was qualified for consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(5). This statute permits consecutive sentences to be considered when

> [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

Tenn. Code Ann. § 40-35-115(b)(5).

On appeal, the Defendant argues that his consecutive sentence was "excessively punitive" and that "there was nothing about [the offenses] that makes this case especially aggravated when compared to other child rape cases, such that consecutive sentences were necessary." The Defendant maintains that the offenses occurred on one night and caused no lasting physical injuries. In other words, the Defendant contends that because two aggravating circumstances listed in section 40-35-115(b)(5) were absent, the trial court abused its discretion by imposing consecutive sentences. We respectfully disagree.

This Court has previously held that "not all of the aggravating circumstances listed in section 40-35-115(b)(5) must be present to support the imposition of consecutive sentencing." *State v. Doane*, 393 S.W.3d 721, 738 (Tenn. Crim. App. 2011) (citation and internal quotation marks omitted). In fact, "consecutive sentences may still be appropriate under section 40-35-115(b)(5) even when one factor militates against them if the other aggravating circumstances have been established and carry sufficient weight." *Id.*

In this case, the trial court carefully considered the aggravating circumstances required by section 40-35-115(b)(5): (1) the relationship between the Defendant and the victim; (2) the time span of the Defendant's undetected sexual activity; (3) the nature and scope of the sexual acts; and (4) the extent of the residual, physical and mental damage to the victim. Consistent with the Defendant's argument, the trial court found that the time span of the undetected sexual activity did not weigh in favor of consecutive sentences.

However, the trial court found that the remaining aggravating circumstances had been established in this case. Specifically, the trial court found that the Defendant exploited his relationship as the victim's putative stepfather to gain access to her and to accomplish the offenses, giving significant weight to aggravating circumstance (1). *E.g.*, *State v. Brady*, No. E2019-00947-CCA-R3-CD, 2020 WL 1847480, at *12 (Tenn. Crim. App. Apr. 13, 2020) (affirming imposition of consecutive sentences, in part, and giving weight to the "relationship between Defendant and the victim because Defendant was the victim's father figure"), *no perm. app. filed*. As to aggravating circumstance (3), the trial court found that because the Defendant "penetrated or attempted to penetrate the victim in every possible way," the nature and scope of the acts weighed in favor of consecutive sentencing. Specifically, the trial court said that "this was about as bad of a one-time incident as you can possibly imagine." *E.g.*, *State v. Mason*, No. E2019-00174-CCA-R3-CD, 2020 WL 5015903, at *35 (Tenn. Crim. App. Aug. 25, 2020) (affirming imposition of consecutive sentences, in part, when "the abuse involved multiple types of sexual penetration"), *perm. app. denied* (Tenn. Jan. 14, 2021).

Finally, the trial court credited the victim's testimony to find that she was still suffering from the psychological pain of the offenses, thereby establishing aggravating circumstance (4). *See State v. Pruitt*, No. E2021-01118-CCA-R3-CD, 2022 WL 4005810, at *6 (Tenn. Crim. App. Sept. 2, 2022) (affirming imposition of consecutive sentences, in part, stating that "the record supports the trial court's determination that the victim suffered from residual and mental damage as a result of the abuse sufficient to support this aggravating circumstance and that the trial court did not abuse its discretion in this regard"), *perm. app. denied* (Tenn. Jan. 11, 2023).

Even after finding these factors, the trial court determined that partial consecutive sentences best served the purposes and principles of sentencing. We conclude that the trial court acted within its discretion in imposing the sentence in this case.

**CONCLUSION**

In summary, we hold that harmless errors exist in the admission of the Defendant's statements related to his purported exercise of constitutional rights. We discern no error in the remaining issues. Accordingly, we respectfully affirm the judgments of the trial court.


_____
TOM GREENHOLTZ, JUDGE